# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 14, 2004 Session

## STATE OF TENNESSEE v. MICHAEL LYNN STANTON

**Appeal from the Criminal Court for Knox County**
**No. 67854     Mary Beth Liebowitz, Judge**

---

**No. E2003-02675-CCA-R3-CD - Filed April 15, 2005**

---

The defendant, Michael Lynn Stanton, was convicted of first degree murder, attempted first degree murder, and two counts of aggravated burglary. The jury returned a verdict of life without parole for the murder conviction. See Tenn. Code Ann. § 39-13-204. The trial court imposed sentences of sixty years for the attempted murder conviction and fifteen years for each of the aggravated burglary convictions. The trial court ordered consecutive service, but with the aggravated burglary sentences to be served concurrently to one another, for an effective sentence of life without parole plus seventy-five years. In this appeal of right, the defendant asserts that the trial court erred by (1) permitting evidence of prior bad acts; (2) denying his motion for judgment of acquittal on the first degree murder charges; (3) admitting an audiotape recording of a hospital interview with the victim; (4) limiting impeachment of a state witness; (5) failing to declare a mistrial after the state attempted to call a bailiff as a witness; and (6) failing to grant a judgment of acquittal on the aggravated burglary charge contained in count 5 of the indictment or, in the alternative, failing to merge the two aggravated burglary convictions. Because the defendant was entitled to a judgment of acquittal on the aggravated burglary charge of count 5, that conviction is reversed and the charge is dismissed. Otherwise, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Reversed in Part and Affirmed in Part**

GARY R. WADE, P.J., delivered the opinion of the court, in which JOSEPH M. TIPTON and J. CURWOOD WITT, JR., joined.

Mark E. Stephens, District Public Defender; and John Halstead and Robert C. Edwards, Assistant District Public Defenders, for the appellant, Michael Lynn Stanton.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; and Phillip Morton and Paula Hamm, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In June of 1993, the defendant married Tiffany Wensell, approximately one month before she gave birth to their daughter, Brooke. Prior to the marriage, the defendant had exhibited signs of jealousy and abuse, including having struck her in the shoulder with a cordless phone. Within a year after the marriage, Ms. Wensell was visiting her sister-in-law next door and had taken a baby monitor while her daughter was asleep. When the defendant, who had been drinking, arrived at the residence, he became angry and accused Ms. Wensell of having had affairs with a variety of other men, including his brother-in-law. According to Ms. Wensell, the defendant "grabbed onto the handrails of the stairs, and . . . came down like a karate . . . type kick right to the chest." Afterward, the defendant attempted to drive away with his daughter but Ms. Wensell climbed into the bed of his pickup truck and removed the child through the back sliding window. Neighbors intervened when the defendant began to drive away as Ms. Wensell tried to carry the child from the bed of the truck. The couple separated briefly but reconciled and had a son, Mike, in February of 1995.

According to Ms. Wensell, the defendant drank daily. One evening in November of 1996, she returned home late from work after stopping at a co-worker's residence to borrow some clothes. When she arrived, the defendant, who had been drinking to excess, confronted her and, while she was drying her children after a bath, struck her twice in the face with his fist. According to Ms. Wensell, the defendant then announced that he intended to kill himself, went to their bedroom, and fired a 30.06 rifle into the wall. When the defendant later passed out, Ms. Wensell took her two children to the residence of her mother and stepfather and, on the following day, obtained an order of protection from a court. A few days later, Ms. Wensell returned to her residence to attempt to obtain some clothing. When she determined that the defendant's vehicle was not in the driveway, she went inside, saw that the living room was "a wreck," and observed that the television was missing, the VCR was broken, a large stuffed bear had been decapitated, and a blanket had been hung over the picture window. In her son's bedroom, a hammer had been thrown through the television screen, and in the kitchen, the refrigerator had been overturned and the telephone had been torn from the wall. According to Ms. Wensell, the defendant suddenly emerged from their bedroom, struck her with his fist, dragged her into the bedroom, and then raped her. As he did so, she saw "bullets all over the bed." When she attempted to escape, the defendant threw her keys into the yard and "pushed" a knife into her right side, causing a puncture wound. Ms. Wensell was able to leave only because her brother and stepfather, who were on their way to a movie, happened to stop by the residence.

As a result of the incident, the defendant was arrested for rape and aggravated assault and Ms. Wensell and her children were able to move back into the residence. The defendant was later convicted on each charge.

On February 11, 1997, while the charges were still pending, the defendant, who had arranged for his son to stay overnight with him, telephoned and informed Ms. Wensell that he was returning the child because he had an ear infection. Even though Ms. Wensell objected because of snow and ice on the roadways, the defendant arrived at 1:00 a.m. with their son in an unsecured car seat. According to Ms. Wensell, she ran to the vehicle, took custody of her son, and then returned to the residence and locked the door. When the defendant kicked a hole in the door and displayed a

hunting knife, she telephoned her mother and stepfather and the defendant left. Afterward the defendant was charged with and ultimately convicted of attempted burglary for which he spent eight months in jail. By June of 1997, Ms Wensell, who by then had begun a relationship with Jody Reynolds, filed suit for divorce.

Almost two years passed before the incident which led to the charges at issue. At approximately 9 or 10 a.m. on April 3, 1999, Ms. Wensell picked up her daughter at the residence the defendant shared with his parents. Later, at approximately 8 or 9 p.m., after having dinner at the residence of Reynolds's mother, Ms. Wensell and Reynolds returned with the children to her residence. After the children had been placed in bed, Ms. Wensell saw headlights in the driveway and immediately telephoned her mother and stepfather because, in the past, they had been able to get there to help more quickly than the police. She asked Reynolds to go to the bedroom where she kept a gun for protection purposes.

According to Ms. Wensell, the defendant knocked on the door, cursed, and demanded to be allowed inside. She did not respond and the defendant left the front porch. Ms. Wensell then heard a gunshot from the back of the residence, ran towards her daughter's bedroom, and saw the defendant pointing a gun at her through a window. As she turned to run, she was shot in the upper right shoulder and then heard another shot before Reynolds appeared in the doorway to check on her. Ms. Wensell recalled that Reynolds then took the two children, both of whom had been awakened, to the living room just before the arrival of her stepfather, Larry Sharp. According to Ms. Wensell, Sharp prayed with her before walking out into the hallway, where he was shot and fell face down. Ms. Wensell heard two more gunshots before the defendant asked his daughter "to call 911 for daddy." When Ms. Wensell called out for Sharp, the defendant responded, "I shot him." As she lay in the fetal position, "play[ing] dead," she overheard the defendant say, "Oh God, I can't believe I've done this."

At trial, Ms. Wensell acknowledged that she had repeatedly visited the defendant while he was in jail on the various charges she had brought against him since 1993, explaining that he had asked her to visit and to bring the children with her. She admitted that she had spent the night with the defendant on several occasions but insisted that she had been forced to do so. Ms. Wensell, who took the children to the defendant's residence for visitation every other weekend, asserted that any time she spent with the defendant since their separation was in relation to child visitation. While aware that Reynolds had once made a threat toward the defendant, Ms. Wensell emphasized that she had not asked Reynolds to intervene on her behalf.

Reynolds, who had dated the victim during high school, testified that he began to see her again in early 1997 and that while their relationship was occasionally intimate, Ms. Wensell had always insisted that they merely be friends. He recalled that in 1998, the defendant, upon being released from jail, telephoned him and, after initially thanking him for watching after "the kids," became confrontational. He also acknowledged that sometime later in the year, he became angry when he saw Ms. Wensell's vehicle at the defendant's residence after 2:00 A.M., leaving a "nasty note" on her windshield, and sounding his horn as he left.

Reynolds testified that on the day of the shooting at approximately 11:00 p.m., he was watching television with Ms. Wensell when she cried out, "Oh, my God, it's [the defendant]," and immediately telephoned her stepfather, Larry Sharp. According to Reynolds, he initially hid in the bedroom hoping that the defendant would leave. He recalled that when the defendant went to the back of the residence and attempted to kick in the kitchen door, he found a loaded shotgun beneath a mattress and then tried to pull Ms. Wensell to safety. As he did so, he saw the defendant draw a pistol from his waistband and heard Ms. Wensell exclaim that she had been "hit." According to Reynolds, he placed Ms. Wensell on the bedroom floor because the defendant was still attempting to break through the back door. He then "step[ped] back into the hallway . . . , knelt down on one knee and took aim into the kitchen." At that point, the defendant, still armed with the pistol, entered the residence and Reynolds shot him.

After checking on Ms. Wensell, Reynolds telephoned 911 and re-loaded the shotgun before checking on the defendant. According to Reynolds, the defendant, who was still conscious, was lying on the floor with a gun pointed in Reynolds' direction. According to Reynolds, Larry Sharp then arrived and began to pray with Ms. Wensell. Reynolds testified that he warned Sharp, who appeared to be in a state of shock, that the defendant was armed, but that Sharp nevertheless walked towards the kitchen. According to Reynolds, Sharp was then shot in the head and fell to the floor. Reynolds testified that he took the children outside to Ms. Wensell's vehicle and attempted to find a line of sight to shoot the defendant a second time but was unable to do so before police arrived. He recalled that while he was talking to the police, they heard the sound of two more gun shots.

As a part of the state's proof, the defendant's 911 telephone call was placed into evidence. The defendant reported to the operator that he had been shot and was unable to move.

Sergeant D.C. Hicks of the Knox County Sheriff's Department, who responded to the shooting, testified that he and officer Rick Hawkins removed two small children from a sport utility vehicle in the driveway. Sergeant Hicks described the children as hysterical. Officers found the defendant injured in the living room and Sharp on the floor in the hallway.

Officer Hawkins heard two or three shots fired while he was interviewing Reynolds. Assistant Chief Deputy Keith Lyon, who was also at the scene, testified that he found Ms. Wensell trembling and in a fetal position in the bedroom. He found a revolver with one live bullet and five spent casings on the top of the washer in the kitchen.

TBI Special Agent Randall Nelson, who examined a pane of glass removed from the kitchen door and one taken from the kitchen window, qualified as an expert. His testing of the window panes established that in each case, the force that had caused the hole traveled from the outside of the residence toward the inside of the residence.

Special Agent Robert Royse examined each of the two bullets recovered from the body of Larry Sharp and the five cartridge cases collected from the revolver found at the scene. He determined that the bullets were fired from the Colt .22 caliber revolver.

Julia Delacy, who prepared a pre-sentence report on the defendant in June of 1997 in connection with his convictions for the rape and aggravated assault of the victim, read the statement provided by the defendant at that time:

> I have never been hurt mentally so bad in my life. I felt my whole world had been blown apart. I was intoxicated and couldn't control emotions and like a coward I reacted with violence. She came home, I hit her, choked her, and threatened her. I forced her to have sex with me. I felt she was my wife. If anybody was going to have sex with her, I was. Then later I stuck a knife through her side to threaten her again and I poked her with it.

Deputy Scott Brown, who was a guard over the defendant at the hospital, testified for the state. He recalled that when the defendant awoke after his treatment, he asked the officer why he was there and then commented, "My father-in-law wouldn't keep his nose out of our business."

Dr. Sandra K. Elkins, who performed the autopsy on Sharp, testified that there were three small caliber gunshot wounds: the first, which was to the head, entered above the right ear; the second entered the back of the neck, exited the left side of the neck, re-entered the top of the left shoulder, and then exited the side of the left upper arm; and the third entered the right side of the back. She stated, however, that she could not determine the sequence of the wounds. During cross-examination, Doctor Elkins acknowledged that Sharp was six feet tall and weighed 210 pounds. She further acknowledged that because there was no gunshot residue on the body, the gun was likely fired from more than two feet away.

Several witnesses testified on behalf of the defense. Eugene Dunn, who lived across the street from the defendant, testified that on the morning of the offenses, he saw Ms. Wensell and the defendant "just playfully wrestling . . . around the yard" while the children where on the swing set. The defendant's nephew, Aaron Scott Williams, testified that after the defendant's release from jail in February of 1998, Ms. Wensell visited often and spent the night on several occasions. He described their relationship as very affectionate and recalled that on the date of the shootings he and the defendant went fishing. According to Williams, the defendant, who had consumed some beer during the afternoon, was in a good mood at 9:00 p.m. despite the fact that his children were apparently not coming to visit. Williams testified that he had never seen the defendant behave violently.

Brandon Ingle, the defendant's cousin, testified that Ms. Wensell had never expressed any fear of the defendant and recalled that in December of 1997, Reynolds had approached him in a bar and threatened him, directing him and the defendant to quit coming around Ms. Wensell's residence. Ingle maintained that he felt threatened by Reynolds and, while denying that the defendant was a violent person, conceded that the defendant generally passed out when he drank alcohol.

Max Stanton, the defendant's father, testified that Ms. Wensell "was always welcome" at his residence and claimed that they "continued on a friendship basis even when [the defendant] was

incarcerated." He recalled that after the defendant was released from jail, Ms. Wensell would bring the children over regularly, staying overnight on several occasions and spending time "privately" with the defendant. Stanton testified that late in 1998 or early in 1999, he had seen bruises on his granddaughter's left cheek and back and had informed Ms. Wensell that "since she had a live-in boyfriend . . . I better not hear of him laying a hand on the grandchildren." It was his recollection that Ms. Wensell did not respond to the comments. Stanton, who was employed at Brushy Mountain prison, acknowledged that the murder weapon was his and that he had won it on a football board at his place of employment. According to Stanton, he found that the weapon was missing after the shootings. Stanton acknowledged that there was a court order of protection prohibiting the defendant from being around Ms. Wensell or her residence.

Connie Stanton, the defendant's mother, confirmed much of the testimony provided by her husband, Max Stanton. She recalled that in February of 1998, when the defendant was furloughed to attend his grandfather's funeral, the victim spent the night with the defendant and accompanied him to the funeral. She also recalled that after the defendant was released from jail, the victim and her children were often at their residence, occasionally spending the night. According to Ms. Stanton, the victim was to spend the night on which the offenses occurred at their residence with the children so that they could all go out together to fish the next day on Easter Sunday. She recalled that the defendant, who was visiting with his sister, was checking in every couple of hours to determine whether the victim had arrived. Ms. Stanton testified that the defendant, who she did not believe had been drinking, returned to the residence and went to bed at approximately 9:00 or 9:30 p.m. but later left again, recalling that she had just "dozed off" when she heard her car start. It was her understanding that the defendant was unaware that another man was possibly living at her former daughter-in-law's residence.

On cross-examination, Ms. Stanton acknowledged that she had asked the defendant's probation officer to release him to a "substance abuse facility and to family counseling or anger management." According to Ms. Stanton, the defendant was supposed to attend anger management sessions after work but did not do so. She conceded that his anger problem "was worse when he drank."

The defendant's sister, Regina Smith, testified that while the defendant was in jail, she had seen Reynolds at the victim's residence dressed only in a pair of shorts "watching the kids." According to Ms. Smith, the defendant and the victim were affectionate even after he was released from jail in the summer of 1998 and they often went out to dinner and spent time together. Ms. Smith also acknowledged that she had written the defendant's probation officer asking for "counseling for alcohol and spousal abuse," hoping for "a chance to straighten out his life."

Other witnesses, Tiffany Weeks and Greg Testerman, acquaintances of the defendant, confirmed that the victim and the defendant often spent time together after his release from jail in 1998.

Dr. Hobart Akin, a trauma surgeon, treated the defendant for a shotgun wound to the back just above the right kidney. Dr. Akin performed exploratory surgery and found that most of the

-6-

injury was to the back muscles. He suggested that it was unlikely that the defendant could have shot a gun accurately immediately after having been shot himself. Dr. Akin did state, however, that the defendant would have regained his fine motor skills within five minutes after being wounded.

As a part of its rebuttal, the state presented additional testimony from the victim, Tiffany Wensell, who had made the following statement to police on August 26, 1998:

Victim states that her estranged husband . . . has called her mother's residence repeatedly this day. Victim states that her[] estranged husband, the suspect, has physically abused her in the past and is on probation for aggravated assault against victim. Suspect has c[o]me to victim's residence and turned around in her driveway after calling her and stating he was on a mission.

Another statement made on September 3, 1998, was presented as a part of rebuttal:

Victim stated suspect called asking to take their son to a ball game on Tuesday. Victim stated suspect became verbally abusive and started threatening her. Suspect said he would be there in ten minutes and she would not know he was there. He stated he would kill her and she would not know it was coming. Suspect also told victim her days were numbered.

In addition, the victim testified that when she applied for the protective order some two months later, on October 29, 1998, she alleged in her petition that when the defendant was released from jail on February 18, he "immediately told [her] he should have killed [her] when he had the chance." She recalled having alleged that the defendant had "been coming by [her] house and pulling in the driveway" and that in April, he "stabbed her tires."

Sergeant Mike Lett, who provided firearms instruction at the Knox County Sheriff's Department Training Academy, testified that the single action revolver used in the shootings was "like the old cowboy western gun you saw on T.V.[,] . . . this weapon has to be cocked each time before it can fire." According to Sergeant Lett, the weapon also "takes a little while to load . . . because you have to put [it] on half-cocked[,] . . . then you have to rotate the cylinder each time you want to put a round into the chamber."

I

Initially, the defendant contends that the trial court erred by admitting testimony concerning prior acts of violence by him toward the victim. He argues that it constituted inadmissible propensity evidence, the probative value of which was outweighed by unfair prejudice, and that the evidence should have been excluded or more limited by the trial court. The state asserts that the evidence was properly admitted.

Tennessee Rule of Evidence 404(b), which governs the admissibility of evidence of other bad acts, provides as follows:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the defendant, absence of mistake, and the existence of a common scheme or plan. See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Cohen et al., supra § 4.04[8]. Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983).

After a hearing held outside the jury's presence, the trial court determined that the defendant's prior violent acts toward the victim had been proved by clear and convincing evidence and were relevant to the defendant's motive and intent as to both the victim and Sharp. The trial judge also found that the evidence was not so prejudicial as to outweigh its probative value. Because the trial court substantially complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

After hearing the victim's proposed testimony as to each incident, as well as argument by counsel, the trial court relied primarily upon State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993), and State v. Hall, 958 S.W.2d 679 (Tenn. 1997), in determining that the evidence was relevant to the defendant's motive and intent, material issues in the case. In Smith, this court ruled that "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show [the] defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." 868 S.W.2d at 574 (Tenn. 1993) (citing State v. Turnbill, 640 S.W.2d 40 (Tenn. Crim. App. 1982); State v. Glebock, 616 S.W.2d 897 (Tenn. Crim. App. 1981)); see also Hall, 958 S.W.2d at 707-08 (appendix). With regard to the defendant's claim that some, if not all, of the acts were too remote in time to be relevant, it is the state's position that they may be properly considered as a "chain of events," such as that recognized by this court in State v. Glebock, rather than isolated instances. Glebock, on trial for a shooting that occurred in January of 1979, complained on appeal that the trial court erred by admitting evidence that he had broken into the victim's apartment in March of 1975 and that he had sent the victim a threatening postcard in August of 1975. This court, however, held that the evidence had been properly admitted:

> As outlined above, there is evidence that the defendant was persistent in abusing and harassing the victim from the time they were separated until the crime was committed. These two incidents were but two episodes in this chain of events which was broken only for a relatively short period after the victim moved to Memphis and before he learned of the victim's whereabouts through his persistent investigation. The relations existing between the victim and the defendant prior to the commission of the crime are relevant. These relations indicate hostility toward the victim and a settled purpose to harm or injure her.

616 S.W.2d at 905-06 (citations omitted).

The facts here are comparable. In our view, the trial court did not abuse its discretion by holding that the probative value of the prior bad acts testimony outweighed the danger of unfair prejudice. Initially, the evidence provided background information and was necessary to explain, among other things, why the defendant was not permitted to enter the victim's residence, why the victim kept a loaded shotgun beneath her mattress, and why, on the evening of the offenses, the victim immediately summoned help from Sharp rather than the police. More importantly, however, the evidence, which showed a history of anger and jealousy on the part of the defendant and a related, settled intent to harm the victim, was probative of the defendant's motive and intent in breaking into the victim's residence and in committing the shootings. While the defendant himself

did not testify as to the circumstances of the offenses, the defense was able to raise the specter, at least with regard to Sharp, that the shooting, although based on mistaken identity, was in self-defense. Accordingly, the defendant's history of domestic violence toward the victim, in which Sharp sometimes intervened, would have been particularly probative. Finally, it is our observation that while the prior bad acts all involve violence by the defendant, they were not so similar to the murder and burglary charges on trial so as to confuse the jury or obscure the issues. Although prior bad acts should be carefully scrutinized prior to their admission, it is our conclusion that the trial court did not abuse its discretion by determining that their probative value outweighed their prejudicial effect.

## II

Next, the defendant contends that the trial court erred by denying his motion for judgment of acquittal on the first degree murder charges. He argues that the proof showed that he was acting in self-defense and that the state failed to prove premeditation or that the killing occurred during the commission of a felony.

Rule 29 of the Tennessee Rules of Criminal Procedure empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. Overturf v. State, 571 S.W.2d 837 (Tenn. 1978). At the point the motion is made, the trial court must favor the opponent of the motion with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Hill v. State, 470 S.W.2d 853 (Tenn. Crim. App. 1971). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Anderson, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). That is, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979); see Tenn. R. App. P. 13(e).

First degree murder is:

> (1) A premeditated and intentional killing of another; [or]
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy
> . . . .

Tenn. Code Ann. § 39-13-202(a)(1) – (2). Premeditation is defined as follows:

> [P]remeditation is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused

-10-

for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Whether the evidence is sufficient depends entirely on whether the state was able to establish beyond a reasonable doubt the element of premeditation. See State v. Sims, 45 S.W.3d 1, 7 (Tenn. 2001); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

Our supreme court has held that the presence of premeditation is a question for the jury and may be inferred from the manner and circumstances of the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Moreover, it is well-established that premeditation may be proved by circumstantial evidence. See, e.g., State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Our high court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. See Pike, 978 S.W.2d at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d); see Pike, 978 S.W.2d at 914-15; Bland, 958 S.W.2d at 660.

One treatise provides that premeditation may be inferred from events that occur before and at the time of the killing:

Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, Substantive Criminal Law § 14.7(a) (2d ed. 2003).

Tennessee Code Annotated section 39-11-611, which governs self-defense, provides, in pertinent part, as follows:

(a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The

person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

\* \* \*

(d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

(1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

(2) The other nevertheless continues or attempts to use unlawful force against the person.

Tenn. Code Ann. § 39-11-611(a), (d).

In our view, the trial court did not err by denying the defendant's motion for judgment of acquittal. There was sufficient evidence to support a finding of guilt beyond a reasonable doubt on each of the two first degree murder charges. While the defendant admitted to killing Sharp, he contended that he acted in self-defense. The evidence, however, demonstrated that the defendant was the initial aggressor, that Sharp was unarmed, and that Sharp had been shot twice after he had been incapacitated by a gunshot wound to the head. There was nothing to suggest that he acted aggressively toward the defendant prior to being shot. Although the defendant argues that he was mistaken as to Sharp's identity and would have been justified in shooting Sharp had Sharp been Reynolds, the jury could have found beyond a reasonable doubt that the defendant continued to demonstrate an intent to murder. As was its prerogative, the jury accredited the testimony of the state's witnesses and rejected the defendant's claim that the killing was in self-defense. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) ("It is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact.").

Likewise, there was substantial evidence to support a finding beyond a reasonable doubt that the killing was premeditated. The record reflects that the defendant armed himself prior to going to the victim's residence, taking a gun from his father's bedroom drawer without permission and then obtaining bullets from an unknown source. After shooting Ms. Wensell and then being shot by Reynolds, the defendant lay in wait in the kitchen. Although Reynolds was armed, Sharp was not. Sharp was shot three times, with the last two shots being fired after he was on the floor, obviously helpless. Testimony demonstrated that the single-action revolver had to be cocked before the trigger could be pulled. While in the hospital, the defendant further incriminated himself by suggesting that "[Sharp] wouldn't keep his nose out of our business." That the defendant may have thought he was firing at Reynolds rather than Sharp would not alter the analysis:

The definition of "intentional" in the statute does not require the [s]tate to prove that the defendant killed the intended victim. Instead it requires the [s]tate to prove that the defendant intended to kill a person, i.e., that the defendant had a "conscious

objective or desire to . . . cause the result." As in the present case, where a defendant, acting with premeditation and deliberation, kills one person while intending to "engage in the conduct or cause the result," first degree murder is proven. . . .

Millen v. State, 988 S.W.2d 164, 165 (Tenn. 1999).

Finally, the defendant argues that the state failed to prove that the killing of Sharp occurred during the commission "of the underlying felonies of attempted first degree murder of [the victim] and aggravated burglary." In considering whether the evidence is sufficient to support a conviction of first degree murder in the perpetration of a felony, a reviewing court must determine whether the killing is closely connected to the felony in time, place, causation, and continuity of action. State v. Pierce, 23 S.W.3d 289, 295 (Tenn. 2000). "[I]t is not required that the felony be committed contemporaneously with the murder." State v. Morris, 24 S.W.3d 788, 799 (Tenn. 2000). In this instance, the killing of Sharp was inextricably connected to the attempted first degree murder of the victim and to the aggravated burglary of the residence. There was no break in the chain of events, all of which occurred at the victim's residence within ten to fifteen minutes. Cf. Pierce, 23 S.W.3d at 297 (holding that killing taking place 20 days after initial theft in a separate state was not sufficiently connected to theft in time or place to support the defendant's felony murder conviction). In short, there was sufficient continuity of action between the defendant's breaking into the victim's residence and his shooting Sharp to warrant his conviction for murder during the perpetration of a felony.

### III

Next, citing Rule of Evidence 403, the defendant argues that the trial court erred by permitting the state to play an audiotape made when officers interviewed the victim at the hospital, arguing that the content was unduly prejudicial. The trial court admitted the tape under the excited utterance exception to the hearsay rule, see Tenn. R. Evid. 803(2), and the defendant does not challenge the admissibility of the evidence under the rule against hearsay.

Tennessee Rule of Evidence 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403.

The record reflects that the tape recording, approximately three to five minutes in length, was made by officers within an hour of the offenses. On the tape, the victim questions officers as to who else was shot and whether their families had been contacted, then provides a limited description of the circumstances surrounding the shootings. Defense counsel objected at trial, arguing that the contents of the tape constituted "raw, pure emotion," added nothing to the victim's testimony, and

presented a substantial danger of unfair prejudice. While observing that the content was "a difficult thing to listen to," the trial court permitted the state to play the audiotape to the jury.

In our view, the audiotape should have been excluded under Rule 403. The victim can be heard moaning, sobbing, and screaming in grief and hysteria. Although some of her statements are discernable, many are inaudible because of moaning and crying. The assistant district attorney described the recording as follows: "They're asking her questions, and, she's not giving, you know, coherent answers." Further, the tape content does not provide new or additional information or otherwise enhance the trial testimony of the victim. Because the recording could have only served to inflame or otherwise appeal to the emotions of the jury and served no evidentiary purpose, the trial court's failure to exclude the audiotape qualified, in our assessment, as an abuse of discretion. See State v. McCary, 119 S.W.3d 226, 246 (Tenn. Crim. App. 2003).

Nevertheless, it is our view that the error was harmless in that it did not affect the verdict. See Tenn. R. Crim. P. 52(a). In context, the tape lasted no more than five minutes in the week-long trial. In contrast, the evidence of the defendant's guilt as to each of the offenses was simply overwhelming.

IV

Next, the defendant contends that the trial court erred by prohibiting him from impeaching state witness Jody Reynolds with a statement he had given the day after the shootings. The state argues that the statement was properly excluded as a speculative lay witness opinion.

Denial of the right to effectively cross-examine is "'constitutional error of the first magnitude'" and amounts to the denial of a basic right essential to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308 (1974)). While the right is fundamental, the propriety, scope, and control of cross-examination is left to the sound discretion of the trial judge. Davis v. State, 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts cannot interfere with the exercise of that discretion absent a clear and plain abuse. See State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460, 464 (1963); Coffee v. State, 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948).

The record reflects that on the day after the shootings, Jody Reynolds returned to the victim's residence and made a videotape of the scene. The state was permitted to show the video to the jury. The audio, however, consisting of commentary by Reynolds, was not allowed as evidence. The defense then sought to cross-examine Reynolds, using portions of his audiotaped commentary and was allowed to question him regarding the statement, "I believe [the defendant] shot [Sharp] through the bottom side of this table because I came back in here earlier with a live round to shoot him again and get the gun, and he had the gun pointed at me through this table. I just happened to get away in time." The trial court did not permit, however, evidence of a second statement: "[The defendant] obviously thought it was me – [Sharp] was me." In doing so, the trial court held that while Reynolds could testify as to the sequence of events, his opinion as to what the defendant thought was "pure speculation."

-14-

In our view, the trial court did not abuse its discretion by prohibiting reference to the second statement. Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless . . . the witness has personal knowledge of the matter." Tenn. R. Evid. 602. This court has previously stated that "[w]hile the rule fails to define what constitutes 'knowledge,' the rule does not require 'absolute certainty.' . . . Nevertheless, the witness/declarant's statement may not be based on mere speculation." State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). Although Reynolds was competent to testify regarding those circumstances of the shootings that he saw, heard, or otherwise experienced first-hand, his conjecture as to the defendant's thought processes during the events was inadmissible.

Rule 701 of the Tennessee Rules of Evidence, which governs opinion testimony by lay witnesses, provides in pertinent part as follows:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> (1) rationally based on the perception of the witness and
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). The Advisory Commission Comment observes as follows:

> The rule rather specifically circumscribes the area where a lay witness can testify to opinions as opposed to facts. The Commission believed that the instances would be rare where a witness could not convey thoughts to the jury by enumerating facts, leaving it to the jurors to draw inferences. In situations where a witness "cannot readily and with equal accuracy and adequacy" testify without an opinion, the witness may state opinions requiring no expertise. Consequently, a lay witness may testify that a person was "drunk" or that a car was travelling "fast."

Tenn. R. Evid. 701, Advisory Comm'n Comment.

Because it was speculative, Reynolds's statement a day after the shooting that the defendant mistook Sharp for him would not have been "helpful to a clear understanding" of his testimony. The essence of Reynolds's trial testimony concerned the sequence and timing of events between the wounding of the victim, his shooting of the defendant, and the defendant's shooting of Sharp. Those events were conveyed to the jury by the recitation of facts. Lay opinion, under these circumstances, was superfluous. The testimony provided the jury the opportunity to infer that the defendant mistook Sharp for Reynolds. That the jury rejected the inference, as was its prerogative, does not mean that there was error. See Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956).

V

The defendant next argues that the trial court erred by failing to grant a mistrial after the state attempted to call Officer James Carson as a rebuttal witness to testify as to his personal experience

-15-

with having been shot. He asserts that because Officer Carson was a bailiff in this case, his mere presence on the witness stand was prejudicial, even though his testimony was ultimately disallowed. The state points out that the defendant failed to request a mistrial and contends that there was no prejudice to the defendant as a result of its aborted attempt to call the officer.

The record reflects that after the testimony of Sergeant Lett, the state sought to call Lieutenant Carson as a witness and the trial court immediately asked counsel to approach the bench. After initially addressing counsel outside the hearing of the jury, the trial court excused the jury from open court and heard argument concerning the admissibility of Lieutenant Carson's testimony. The assistant district attorney submitted that the witness was being offered "to rebut the testimony of Dr. Hobart Akin" that a gunshot wound would result in, among other things, a loss of fine motor skills and an inability to react rationally. She indicated that Lieutenant Carson would testify that when he suffered a gunshot wound during the line of duty, he was aware of his circumstances and able to act appropriately to summon help. After observing that Lieutenant Carson had been in charge of the jury for several days, the trial court excluded the testimony, concluding that the potential prejudice outweighed the probative value under Tennessee Rule of Evidence 403.

Initially, this issue has been waived by the failure to make a contemporaneous motion for mistrial. See State v. Lockhart, 731 S.W.2d 548, 550 (Tenn. Crim. App. 1986) (holding that defendant had waived issue of prejudicial remark made by prospective juror during voir dire where defense counsel had failed to make contemporaneous objection or motion for mistrial), overruled on other grounds by State v. Rickman, 876 S.W.2d 824 (Tenn. 1994); State v. James Cohea, No. 89-57-III (Tenn. Crim. App., at Nashville, Oct. 17, 1989) (holding that failure to move for mistrial based on prospective juror's prejudicial comment until after jury was sworn constituted waiver of the issue). Even on the merits, however, the defendant would not be entitled to relief on this claim.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." Id.

In revisiting this issue relative to the defendant's motion for new trial, the trial court ruled as follows:

> Lieutenant Carson was called to the stand to testify and not allowed to testify by the [c]ourt. Lieutenant Carson, for the record, is one of the supervisors of the court officers but is not over the jury. . . . Although Officer Carson did some transportation and . . . supervised the others, he was not one of those who stayed with jurors, spent nights with jurors, ate with jurors. That was not a part of his function. He had no direct discussion contact with jurors . . . and that has not been raised. That he was called to testify and then . . . did not testify sometimes happens, . . . so obviously the jury sees that the [c]ourt has not allowed the witness to testify.

-16-

Somebody's changed their mind. I don't think it had any effect on the jury at all. I don't think that was part of . . . their consideration.

In support of his position, the defendant relies on Turner v. Louisiana, 379 U.S. 466 (1965), wherein Turner, convicted of murder and sentenced to death, claimed that the trial court erred by not declaring a mistrial after two deputy sheriffs in charge of the sequestered jury were permitted to testify on behalf of the prosecution. Although the state supreme court affirmed, the United States Supreme Court reversed the conviction, holding that because the deputies had provided important evidence and credibility was a key issue, the admission of their testimony had "subvert[ed] the[] basic guarantees of trial by jury." 379 U.S. at 473. In our view, however, Turner is distinguishable. Lieutenant Carson was never allowed to testify. The record reflects that as soon as the state announced its intention to call the officer as a witness, the trial court conducted a jury-out hearing wherein Lieutenant Carson swore under oath that he had not had any discussions concerning his prior gunshot injury with any of the jurors. When the jury returned, the state rested and closing arguments followed. Carson did not testify. In Turner, the two deputies not only testified, but offered evidence that "must inevitably have determined whether Wayne Turner was to be sent to his death." Id. In short, there was no error.

VI

Finally, the defendant contends that the trial court erred by not granting a judgment of acquittal on the aggravated burglary charge contained in count 5 or, in the alternative, by failing to merge the two aggravated burglary convictions. The state contends that the two convictions are proper.

The record reflects that counts 5 and 6 of the presentment provide, in pertinent part, as follows:

(5)     On or about the 3rd day of April, 1999, . . . [the defendant] did unlawfully enter the habitation of [the victim] without her effective consent, not open to the public, and did commit assault, in violation of T.C.A. 39-14-403, and against the peace and dignity of the State of Tennessee.

(6)     On or about the 3rd day of April, 1999, . . . [the defendant] did unlawfully enter the habitation of [the victim] without her effective consent, not open to the public, with intent to commit assault, in violation of T.C.A. 39-14-403, and against the peace and dignity of the State of Tennessee.

(Emphasis added.) With regard to count 5, the trial court instructed the jury that "[t]he [s]tate asserts that the defendant committed . . . aggravated burglary with an assault when . . . [he] fired a gun through the kitchen window, striking [the victim]." As to count 6, the jury was instructed that "[t]he [s]tate asserts that the defendant committed . . . aggravated burglary with the intent to commit an assault when [he] entered the habitation and caused the occupants . . . to reasonably fear imminent bodily injury."

-17-

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Burglary is defined by our Code as follows:

> (a) A person commits burglary who, without the effective consent of the property owner:
> (1) Enters a building other than a habitation (or any portion thereof) not open to the public, with intent to commit a felony, theft or assault;
> \*　　\*　　\*
> (3) Enters a building and commits or attempts to commit a felony, theft or assault . . . .
> \*　　\*　　\*
> (b) As used in this section, "enter" means:
> (1) Intrusion of any part of the body; or
> (2) Intrusion of any object in physical contact with the body or any object controlled by remote control, electronic or otherwise.

Tenn. Code Ann. § 39-14-402(a)(1), (3), (b). Aggravated burglary is burglary of a habitation. Tenn. Code Ann. § 39-14-403(a).

Initially, the defendant contends that the evidence is insufficient to support his conviction on count 5 because proof that he fired a bullet into the victim's residence does not constitute proof of "entry." The state argues that the statute is satisfied because the bullet was initially "in physical contact" with the defendant's body at the time he fired the gun and because the bullet was in the "remote control" of the defendant. The state cites no authority for either proposition.

Because the bullet was not in physical contact with the defendant's body, the question is whether penetration of the victim's residence by a bullet constituted "[i]ntrusion of . . . any object controlled by remote control, electronic or otherwise." Tenn. Code Ann. § 39-14-402(b)(2). In matters of statutory construction, the role of this court is to ascertain and give effect to the intent of the legislature. State v. Williams, 623 S.W.2d 121, 124 (Tenn. Crim. App. 1981). Unless ambiguity

requires resort elsewhere to ascertain legislative intent, judicial interpretation of a statute is restricted to the natural and ordinary meaning of the language used. Roddy Mfg. Co. v. Olsen, 661 S.W.2d 868, 871 (Tenn. 1983). "Legislative enactments must be interpreted in their natural and ordinary sense without a forced construction to either limit or expand their meaning." State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982). "Courts must construe statutes as a whole and in conjunction with their surrounding parts and their interpretation should be consistent with their legislative purposes." State v. Turner, 913 S.W.2d 158, 160 (Tenn. 1995). The meaning of a statute is to be determined not from specific words in a single sentence or section but from the act in its entirety in light of the general purpose of the legislation; any interpretation should express the intent and purpose of the legislation. National Gas Distrib., Inc. v. State, 804 S.W.2d 66, 67 (Tenn. 1991); Loftin v. Langsdon, 813 S.W.2d 475, 478-79 (Tenn. Ct. App. 1991). "The cardinal rule of statutory construction is to effectuate legislative intent, with all rules of construction being [aids] to that end." Browder v. Morris, 975 S.W.2d 308, 311 (Tenn. 1998).

In Ex parte James Matthew Hyde, 778 So.2d 237, 238 (Ala. 2000), the Alabama Supreme Court rejected the same theory advocated by the state in this case. In Hyde, the Alabama high court affirmed a felony murder conviction where the defendant fired a shot and "the bullet passed through the door and struck [the victim] in the abdomen." Because the physical evidence demonstrated that the defendant had to have entered the residence to commit the crime, the court affirmed that the evidence was sufficient to have established the commission of the killing during a burglary. Nevertheless, it ruled that entry into the residence of the bullet alone would not have been sufficient:

> We reject the alternative theory stated by the Court of Criminal Appeals that "the entry of the bullet into the house constituted an entry under the burglary statute," and we reject the rationale of that court in this regard. In requiring an entry, the burglary statute requires an entry by some part of the defendant's body or the body of someone acting in complicity with the defendant. § 13A-7-5(a), Ala. Code 1975.

> The theory that the entry by the bullet satisfies the element of entry would render entirely superfluous § 13A-11-61, Ala. Code 1975, specifically condemning shooting into dwellings, because under that theory every shooting into a dwelling would constitute a burglary. Rather, because § 13A-11-61 specifically condemns shooting into a dwelling and does not include any element of physical entry by the defendant himself or herself, this Code section, rather than those statutes defining burglary, govern Hyde's conduct under the rule of statutory construction known as expressio unius est exclusio alterius.

> The Court of Criminal Appeals should have restricted the rationale for its affirmance to the evidence of record, which supports the conclusion that the defendant did, in fact, bodily enter the victim's dwelling to shoot him. The alternative holding -- that the entry by the bullet satisfied the "entry" element of the burglary statute -- is bad and unnecessary law. It abandons the fundamental rule that criminal statutes are construed strictly against the State.

Id. at 239 n.2 (citations omitted).

In our view, the rationale of the Alabama Supreme Court in Hyde is compelling. Although Tennessee does not have a separate statute prohibiting shooting into a dwelling, there is no indication that it was intended to be encompassed by our aggravated burglary statute. The statute requires that the intruding object be "controlled by remote control, electronic or otherwise." A bullet, once fired from a gun, however, is not subject to any form of control. There appears to be no legal authority in Tennessee or any other United States jurisdiction supportive of the state's position. In sum, it is our conclusion that entry of the bullet into the victim's residence did not satisfy the "entry" requirement of the statute and that any other conclusion would constitute "unnecessary law." See id. Accordingly, the defendant's conviction for aggravated burglary under count 5 of the indictment must be reversed and the charge dismissed.

Furthermore, dual convictions for aggravated burglary, under these circumstances, would violate the principles of double jeopardy.

The double jeopardy clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, Article 1, section 10 of the Tennessee Constitution provides that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. 1, § 10. Our supreme court has noted that "three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996) (citations omitted). Proof that the offenses have the exact same statutory elements is not required to establish that offenses are the "same" for double jeopardy purposes. Id. at 379 (citing Jeffers v. United States, 432 U.S. 137 (1977)). Our high court observed that "whether two offenses are the 'same' for double jeopardy purposes depends upon a 'close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances.'" Id. (quoting State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975)). Finally, our supreme court noted that while appellate review must be guided by the test announced in Blockburger v. United States, 284 U.S. 299, 304 (1932), that test is not conclusive of legislative intent and the reviewing court must also examine (1) whether there were multiple victims involved; (2) whether several discrete acts were involved; and (3) whether the evil at which each offense is directed is the same or different. Denton, 938 S.W.2d at 378-79.

The defendant contends that because the evidence "showed that [he] shot through the window and probably within thirty seconds kicked in the door and came in the house," he engaged in a "continuous course of action" that constituted only one crime. The state argues that, just as separate penetrations may support separate convictions in a rape case, each of the two separate entries supports a burglary conviction in this case. See State v. Phillips, 924 S.W.2d 662 (Tenn. 1996). Accordingly, the issue in this case is "multiplicity:"

Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense. Several general principles determine whether offenses are "stacked" so as to be multiplicitous:

1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Id. at 665.

In our view, the defendant's actions in this case do not support separate convictions for aggravated burglary. In Phillips, our supreme court affirmed three separate rape convictions for offenses that occurred over the course of three hours. In doing so, our high court stated as follows:

From a consideration of the facts in the record before us, it is not difficult to conclude that the appellant, indeed, committed three offenses. Without being graphic, each of the above-described sexual acts required a different body position and engaged different body parts. Moreover, the record contains no proof of the duration of each sexual act; however, the proof does show that the entire episode consumed approximately three hours. Acknowledging natural limitations on human sexual endurance, we would be hard-pressed to characterize the appellant's conduct as a "single continuous event." Therefore, each penetration constituted a distinct, unlawful invasion of the victim's body.

Id. at 664. In this case, the defendant fired into Ms. Wensell's residence and then broke down the door, entering bodily, within a matter of moments. There is little, if any, real separation of the defendant's actions by time or location. Under these circumstances, it is our determination that the two burglary convictions would violate our constitutional safeguards and that if the conviction under count 5 were not reversed and dismissed, it would have to be merged into the conviction under count 6.

Accordingly, the conviction for aggravated burglary in count 5 of the indictment is reversed and dismissed. Because the sentence therefor was to be served concurrently, there is no change in the defendant's effective sentence. Otherwise, the judgments of the trial court are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-21-